[No. D066488. Fourth Dist., Div. One. Sept. 10, 2015.]

NORTH COUNTY ADVOCATES, Plaintiff and Appellant, v.
CITY OF CARLSBAD, Defendant and Respondent,
PLAZA CAMINO REAL, LP, et al., Real Parties in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of parts III., IV. and V.

**Counsel**

DeLano & DeLano, Everett L. DeLano III and M. Dare DeLano for Plaintiff and Appellant.

Celia A. Brewer and Jane Mobaldi for Defendant and Respondent.

Alston & Bird, Edward J. Casey and Andrea S. Warren for Real Parties in Interest.

**Opinion**

**HALLER, Acting P. J.**—Real Parties in Interest Plaza Camino Real, LP, and CMF PCR, LLC (collectively, Westfield), proposed to renovate a shopping

center originally built in the City of Carlsbad (City) over 40 years ago.[1] The City approved Westfield's request to renovate a former Robinsons-May store and other small portions of the shopping center (the project). North County Advocates (Advocates) challenged the City's approval under the California Environmental Quality Act (CEQA; Pub. Resources Code,[2] § 21000 et seq.), arguing the project's environmental impact report (EIR) used an improper baseline in its traffic analysis because it treated the Robinsons-May store as fully occupied, even though it was vacated in 2006 and had been only periodically occupied since. Advocates also argued the City violated CEQA by failing to consider as a mitigation measure that it require Westfield to make a fair share contribution to the future widening of the El Camino Real bridge over State Route 78 (the bridge) and by failing to respond adequately to public comments regarding traffic mitigation. The trial court rejected Advocates's CEQA challenges and awarded the City costs for staff time spent reviewing and certifying the administrative record Advocates prepared. Advocates appeals the trial court's CEQA and costs determinations.

We affirm the trial court's CEQA determinations. Substantial evidence supports the City's determination of the traffic baseline because it was based on recent historical use and was consistent with Westfield's right to fully occupy the Robinsons-May space without further discretionary approvals. Substantial evidence also shows the City's consideration of traffic mitigation measures and responses to comments were adequate. However, we conclude the trial court erred by awarding certain subcategories of costs to the City. Accordingly, we reverse the judgment as to three of the four subcategories, and remand for further proceedings in connection with one of them. In all other respects, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Original Project Site*

Westfield proposed to renovate a portion of a shopping center located in the City. Originally built in 1969, the project site was developed "as a two- and three-story indoor shopping center with five main anchor department store buildings (i.e., Sears, Macy's, Macy's Men, JC Penney, and the vacant former Robinsons-May) and numerous smaller retail specialty shops." The site contains over 6,400 surface parking spaces as well as several outbuildings within the main mall parking lots and across a street to the south of the main mall. While Westfield owns the developed parcels within the shopping center, the City owns the surface parking lots.

---

[1] We refer to Westfield and the City collectively as Respondents.

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

Under a "Precise Plan" the City first approved in 1977, Westfield was entitled to renovate the interior of the former Robinsons-May tenant building and fully occupy it without obtaining any further discretionary approvals from the City.

*The Specific Plan and Site Development Plan for the Project*

The City approved two entitlements for the project: (1) a "Specific Plan" to facilitate future development at the shopping center area beyond the project and (2) a "Site Development Plan," which allowed for the immediate project. The Specific Plan area included all of the shopping center buildings and the majority of the shopping center's surface parking areas.

The Site Development Plan allowed for the immediate removal, renovation, and/or redevelopment of portions of the east end of the existing mall structure and associated outbuildings. As described in the "Draft EIR," the Site Development Plan would have allowed for a net increase of approximately 35,000 square feet of gross leasable area. The project initially proposed to build additional retail space west of the Robinsons-May building on three pads built as outparcels within the City-owned surface parking lots to accommodate future restaurant and/or retail space.

*The Final Approved Project*

Because Westfield and the City were unable to agree on lease terms for development of the City-owned outparcels, Westfield reduced the scope of the project as described in the Draft EIR and revised the Site Development Plan. The reduced project still included demolition and reconstruction of the former Robinsons-May store. As revised, the project would result in a net loss of 636 square feet of total gross leasable area in the shopping center.

The project was under construction at the time of the June 2014 hearing on Advocates's petition for writ of mandate and was completed before the 2014 holiday season.

*The City's Environmental Review and Project Approvals*

The City released the Draft EIR on August 31, 2012, with nine technical reports and studies attached as appendices. Those technical studies included a 194-page (excluding supporting appendices) "Transportation Study." The Draft EIR evaluated three alternatives to the project. With implementation of a number of mitigation measures, the Draft EIR concluded the project would not cause any significant environmental impacts.

The City received 10 comment letters on the Draft EIR. The City responded to all of them, and included its responses in the December 2012 final EIR. The City also issued a 37-page "Mitigation Monitoring and Reporting Program" with the final EIR.

On June 5, 2013, the City's planning commission conducted a public hearing and approved the Site Development Plan and recommended approval to the city council of the Specific Plan for the project.

On July 9, 2013, the city council conducted its public hearing on the project. Two members of the public—including Advocates's counsel—expressed concern about the project; three others expressed support. The city council unanimously approved the project, adopted the Specific Plan, approved the Site Development Plan, and certified the final EIR. On July 10, 2013, the City filed a "Notice of Determination" under CEQA.

*Advocates's Petition for Writ of Mandate*

On August 7, 2013, Advocates filed a petition for writ of mandate challenging the City's approvals of the project. As relevant here, the petition challenged the City's determination of the baseline for traffic trips, the EIR's mitigation measures for traffic impacts, and the City's response to comment letters concerning those mitigation measures.

The trial court heard the petition on June 6, 2014; issued an order denying the petition on June 24; and entered a final judgment on July 2.

*The Costs Award*

Westfield filed a memorandum of costs in the amount of $5,490.24, and the City filed one seeking $6,237. Advocates filed motions to tax costs targeting each. The trial court denied Advocates's motions and awarded costs to Westfield and the City according to their memoranda of costs.

*Advocates's Appeal*

Advocates timely appealed the judgment upholding the project approvals and awarding the City its costs. Advocates does not challenge the award of costs to Westfield.

## DISCUSSION

Advocates contends the trial court erred by rejecting Advocates's challenges to the City's (1) use of an incorrect and misleading baseline in the

EIR's traffic analysis, (2) failure to adequately analyze traffic impacts, and (3) failure to adequately respond to comments it received regarding the EIR. Advocates also contends the trial court erred by awarding the City costs for time its staff spent reviewing and certifying the administrative record that Advocates prepared.

## I. GENERAL CEQA PRINCIPLES AND STANDARD OF REVIEW

■ "CEQA embodies our state's policy that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1100 [19 Cal.Rptr.3d 469]; see § 21001, subd. (d).) The EIR is the " 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) Its "function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard Area Citizens*).) "The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

■ An EIR is presumed adequate; the challenger in a CEQA action bears the burden of proving otherwise. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 [148 Cal.Rptr.3d 310] (*Preserve Wild Santee*).) "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 426, fn. omitted.) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' " (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 275.) "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision . . . ." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 427.)

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE CITY'S TRAFFIC BASELINE DETERMINATION

■ "To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 [106 Cal.Rptr.3d 502, 226 P.3d 985] (*Communities for a Better Environment*).) Under the Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines),[3] "the baseline 'normally' consists of 'the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . .' " (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 315, quoting Guidelines, § 15125, subd. (a).)[4]

Advocates contends the EIR's traffic baseline is "incorrect and misleading" because it did not follow the " 'normally' " applicable rule of measuring conditions as they actually existed when environmental review began. (Capitalization & boldface omitted.) Advocates contends the City instead "falsely inflated the existing traffic conditions" by "imputing over 5,000 daily trips" to the baseline premised on a fully occupied Robinsons-May building when, in fact, Robinsons-May vacated the space in 2006. Advocates contends that by falsely inflating the existing traffic conditions, the baseline understates the project's true impact on the environment. We review for substantial evidence an agency's decision to deviate from the normal rule for determining a baseline. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457 [160 Cal.Rptr.3d 1, 304 P.3d 499] (*Smart Rail*) ["If substantial evidence supports an agency's determination that an existing conditions impacts analysis would provide little or no relevant information or would be misleading as to the project's true impacts, a reviewing court may not substitute its own judgment on this point for that of the agency."].)

---

[3] The Guidelines are regulations "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of" CEQA. (Guidelines, § 15000; see § 21083.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 428, fn. 5.)

[4] Guidelines section 15125, subdivision (a) states: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives."

The EIR provides the following explanation of how and why the City deviated from the normal rule in selecting the baseline:

"Westfield Carlsbad currently has vacant leasable space beyond the regular amount expected in super regional shopping centers, mainly the 148,159-square foot Robinson's-May building. Since this space is currently vacant, traffic from this space is not included in the traffic counts conducted at the analyzed intersections and street segments. However, for purposes of determining the Existing Baseline conditions pursuant to CEQA Guidelines Section 15125, trips attributable to that currently unoccupied space were added to the baseline conditions counted in the project area as noted below.

"Trip generation rates and estimates for the vacant Robinson's-May building were estimated using those identified in the San Diego Association of Government's (SANDAG's) *Brief Guide of Vehicular Traffic Generation Rates for the San Diego Region* (SANDAG 2002) for a 'Super Regional Shopping Center' land use. These estimates are conservative in that they do not account for trip reductions from pass-by trips. Based on the rate, the vacant Robinson's-May building could generate a total of 5,186 daily trips on a typical weekday . . . . These modified traffic volumes were added to the existing traffic counts collected in the project area and represent the Existing Baseline conditions for the purposes of this study. [The Transportation Study attached as] Appendix F provides a detailed description of the methodology used to establish the Existing Baseline condition."

The Transportation Study elaborates on the City's determination of the traffic baseline:

"Existing Baseline Conditions—Westfield Plaza Camino Real is an existing super regional shopping [center] which is entitled for 1,151,092 [square feet] of retail commercial space. All of the currently entitled square footage is completely constructed. However, the nature of a shopping center is that tenants change and the amount of occupied space constantly fluctuates.

"Plaza Camino Real currently has unoccupied leasable space beyond the normal amount, mainly the 148,159 [square foot] Robinsons-May building. Since this space is currently vacant, traffic from this space is not included in the actual traffic counts conducted at the analyzed intersections and street segments. However, for the purposes of determining the Existing Baseline Conditions pursuant to California Environmental Quality Act (CEQA) Guidelines Section 15125, trips attributable to that currently unoccupied space are imputed. A full occupancy assumption is consistent with SANDAG's regional traffic modeling methodology which assumes full occupancy of all entitled square footage. It is also consistent with the City of

Carlsbad and City of Oceanside's determination of existing baseline because the currently vacant space could be occupied at anytime without discretionary action. In fact, portions of that space are periodically occupied with temporary uses such as a Halloween store which leases the space in the month of October. For these reasons, full occupancy of all entitled square footage is assumed in determining the Existing Baseline Conditions."

Using the baseline with the imputed Robinsons-May traffic, the Transportation Study concludes the "Project will not result in a significant impact at any of the analyzed intersections during either peak hour, or any of the analyzed street segments during either peak hour or daily conditions."

Advocates contends the California Supreme Court rejected the practice of imputing use levels in *Communities for a Better Environment, supra*, 48 Cal.4th 310. Respondents counter that *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316 [118 Cal.Rptr.3d 182] (*Cherry Valley*), a case decided by Division Two of this court, permits an agency to base an existing conditions baseline on recent historical use levels if those levels are permitted to continue. (*Id.* at p. 337.) We conclude Respondents have the better argument—*Communities for a Better Environment* is distinguishable and *Cherry Valley* is on point and persuasive.

In *Communities for a Better Environment*, the Supreme Court reversed a regional air quality management district's approval of ConocoPhillips's application to modify a petroleum refinery in a way that would increase operation of four boilers that produced steam for refinery operations, but also emitted nitrogen oxide (a major contributor to smog). (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 317.) The district selected as the project's baseline for nitrogen oxide emissions the amount the boilers would emit if they operated at the maximum level allowed under ConocoPhillips's existing permits, even though ConocoPhillips had never operated them at that level. (*Id.* at pp. 318, 322.) Using this baseline, the district concluded the project would not have a significant impact on the environment, even though it was undisputed that the as-modified refinery's emissions would exceed the district's "significance threshold." (*Id.* at pp. 317–318.) The Supreme Court concluded this was error.

█ The Supreme Court approved a line of Court of Appeal decisions that "concluded the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' [citation], that is, the ' "real conditions on the ground" ' [citations], rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation." (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 321.) Applying this general rule, the court concluded the district's selected baseline

was impermissibly "hypothetical" because it was based on maximum permitted operating conditions that were "not the norm." (*Id.* at p. 322.)

But while the Supreme Court recognized public agencies should " 'normally' " use "existing conditions" as the baseline (*Communities for a Better Environment, supra,* 48 Cal.4th at pp. 327, 328), the court also recognized that "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule . . ." (*id.* at p. 328). Citing as an example ConocoPhillips's concern that refinery operations "vary greatly with the season, crude oil supplies, market conditions, and other factors" (*id.* at p. 327), the court explained that agencies may exercise discretion to accommodate a "temporary lull or spike in operations that happens to occur at the time [of] environmental review" (*id.* at p. 328; see *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 125 [104 Cal.Rptr.2d 326] ["Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods."]). As long as that exercise of discretion is supported by substantial evidence, the courts will not disturb it. (*Communities for a Better Environment, supra,* at p. 328.)

Applying *Communities for a Better Environment*, the *Cherry Valley* court upheld a city's "quintessentially . . . discretionary" baseline determination of a project site's water use levels where the site's historical water use fluctuated. (*Cherry Valley, supra,* 190 Cal.App.4th at p. 337.) Sunny-Cal operated an egg farm on the site from the 1960's through 2005, when the site transitioned to cattle ranching and feed crop operations. (*Id.* at pp. 324, 329.) The record showed the egg farm used an average of 1,340 acre-feet annually of groundwater between 1997 and 2001, but the cattle ranch used only 50 acre-feet annually beginning in 2005.[5] (190 Cal.App.4th at p. 329.) In a 2006 revised draft EIR, the city selected as the groundwater use baseline 1,484 acre-feet annually, which was the amount the developer was entitled to extract under a 2004 water-rights adjudication. (*Id.* at pp. 325, 331.) The petitioners contended the baseline should have been the then-existing 50 acre-feet annually level. (*Id.* at p. 336.) The Court of Appeal upheld the city's determination.

The court distinguished *Communities for a Better Environment* and other cases cited by the petitioner on the ground that the baseline in each of those cases was hypothetical because it was based on "conditions that were *permissible* pursuant to an existing plan or regulation but that were not being employed or that did not exist 'on the ground' at the time environmental review commenced." (*Cherry Valley, supra,* 190 Cal.App.4th at p. 338, italics added; see *id.* at pp. 339–340, citing *Woodward Park Homeowners Assn.,*

---

[5] The opinion is silent regarding the site's water use between 2001 and 2005. (*Cherry Valley, supra,* 190 Cal.App.4th at pp. 329–335.)

*Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 693, 697 [58 Cal.Rptr.3d 102] [baseline for 477,000 square-foot office park to be built on vacant lot was apparently based on 694,000 square-foot maximum allowed under applicable zoning] and *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 357–358 [182 Cal.Rptr. 317] [EIR's for two general plan amendments were deficient because they compared the impacts of the amendments with the existing general plan, which projected populations far larger than ever actually materialized].) By contrast, the *Cherry Valley* court concluded substantial evidence showed the baseline was not hypothetical because it was based not only on Sunny-Cal's *entitlement to extract* 1,484 acre-feet annually of groundwater, but also on Sunny-Cal's recent history of *actually extracting* substantially the same amount. (*Cherry Valley, supra*, 190 Cal.App.4th at p. 340.)[6]

■ Like *Cherry Valley* and unlike *Communities for a Better Environment*, the City's selection of a traffic baseline that assumed full occupancy of the Robinsons-May space was not merely hypothetical because it was not based *solely* on Westfield's entitlement to reoccupy the Robinsons-May building "at anytime without discretionary action," but was also based on the actual historical operation of the space at full occupancy for more than 30 years up until 2006. And like the period when Sunny-Cal used less water on its land for cattle ranching and feed crops, the Robinsons-May space was less occupied from 2007 through 2009 (two retail users occupied part of it from August 2006 through December 2007, and two others occupied part of it from August through November in 2008 and in 2009).[7] We view this fluctuating occupancy—which is "the nature of a shopping center"—as akin to the varying oil refinery operations in *Communities for a Better Environment* that led the Supreme Court to recognize that agencies have discretion

---

[6] The Supreme Court recently cited this aspect of *Cherry Valley* with approval. (See *Smart Rail, supra*, 57 Cal.4th at p. 450 [*Cherry Valley* "applied *Communities for a Better Environment*" to demonstrate that "recent historical use [can] constitute[] a realistic measure of existing conditions."].)

[7] Advocates attempts to distinguish this similarity by arguing that environmental review in *Cherry Valley* began in 2004 when Sunny-Cal was still using the project site as an egg farm and extracting 1,340 acre-feet annually of groundwater, whereas environmental review did not begin here until 2009, when the Robinsons-May space had already been vacant for approximately three years. This argument fails. First, the *Cherry Valley* court did not state (as Advocates asserts) that Sunny-Cal "had *actually used* that much groundwater 'since February 2004 . . . .' " (Italics added.) Instead, the court was referring to the fact that "Sunny-Cal's 1,484 [acre-feet annually] *entitlement* to Beaumont Basin groundwater" existed since 2004. (*Cherry Valley, supra*, 190 Cal.App.4th at p. 338, italics added.) Similarly, Westfield's right to fully reoccupy the Robinsons-May space "at anytime without discretionary action" existed since 1977. Second, even though Sunny-Cal was using the project site as an egg farm when environmental review began in 2004, the only evidence of Sunny Cal's actual egg-farm-related water use level discussed in the opinion was from 1997 through 2001—a period that ended, as here, three years before environmental review began. (*Id.* at pp. 329–335.)

" 'to consider conditions over a range of time periods' " to account for a "temporary lull or spike in operations . . . ." (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 328.)

The City's decision to base the traffic baseline on historical occupancy rates is further supported by substantial evidence consisting of SANDAG (San Diego Association of Government) data on such use levels.

Therefore, we conclude substantial evidence supports the City's exercise of discretion in selecting a traffic baseline that assumed a fully occupied Robinsons-May building.

### III.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed with respect to the first, second, and fourth subcategories of the City's costs award. On remand, the superior court is directed to determine how much of the costs in the first subcategory were incurred (1) reviewing the administrative record for completeness or accuracy (for which the City may not recover costs); (2) supplementing the administrative record (for which the City may recover costs); and (3) as a result of a total disregard for cost containment on Advocates's part (for which the City may recover its costs). The judgment is affirmed in all other respects. Real parties in interest are entitled to their costs on appeal; all other parties are to bear their own costs.

Aaron, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 2016, S230690.

---

*See footnote, *ante*, page 94.